# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 04-3863

CR01-154 DWF

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Mark William Samples, | * | |
| | * | |
| Defendant - Appellant. | * | |

Submitted: June 23, 2005
Filed: August 11, 2006 (Corrected: 09/12/06)

Before RILEY, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Following a jury trial, Mark Samples was convicted of robbing a credit union in violation of 18 U.S.C. § 2113(a) and brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). He also pleaded guilty to and was convicted of failing to appear for trial in violation of 18 U.S.C. § 3146(a)(1). After denying Samples's motion for a new trial, the district court[1] sentenced him to eleven years' imprisonment. Samples does not challenge his conviction for failure to appear for trial, but he appeals from the district court's denial of his motion for a new

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

SCANNED
OCT 1 2 2006
U.S. DISTRICT COURT ST. PAUL

trial on the first two counts. He argues that he was deprived of a fair trial by the prosecutor's improper and prejudicial use of three categories of evidence: (1) evidence of his flight as consciousness of guilt; (2) evidence elicited in violation of Rule 704(b); and (3) evidence of his release status. We affirm.

I.

On May 3, 2001, Samples robbed the Red Wing Credit Union at gun point. The gun was fully loaded and he had placed tape over the serial numbers. Samples took about $70,000, which he carried in his arms while fleeing on a bicycle he had purchased the day before. The bicycle crashed while he was riding down a steep hill, causing him to drop the money and the gun. Samples gathered up $10,500 and made his way to a place near the Mississippi River where he had stowed scuba gear. Samples put on his gear and tried to cross the river without success. He stayed in the water for about eight hours before making his way back to where he had parked his car. FBI agents identified Samples as the original purchaser of the gun dropped at the scene of the robbery. When interviewed about the robbery by two FBI agents at his home on May 8, Samples claimed that the gun had been stolen from him in a burglary. Later that day, Samples admitted himself to the psychiatric ward at the Veteran's Affairs Hospital. From the locked ward, he called one of the agents and confessed to the crime.

Samples pled guilty to one count of credit union robbery in August, but he withdrew from the plea agreement eight months later. He then pled not guilty to a superseding indictment and filed a notice of his intention to assert the defense of insanity. After Samples violated the conditions of his bond, a bench warrant for his arrest was issued on June 3, 2002. Samples fled the jurisdiction with his son and was found and arrested 15 months later in Ohio.

At trial, Samples argued that he was not guilty by reason of insanity. He claimed that the combination of his post-traumatic stress disorder and major depression, along with the side effects of the drug Interferon that he was taking for Hepatitis, made him suicidal and delusional at the time of the robbery. Samples testified that after he started taking Interferon, his depression level "really plummeted" and he "started to have episodes where I would think really bizarre things, very disturbing things." He began to believe that his wife was trying to poison him and considered killing her, before resolving to take his own life instead. Samples testified that he decided to rob the credit union to provide for his wife and son, and stated that he carried a gun during the robbery because he was planning to kill himself afterwards. Samples testified that when he entered the bank, "I knew it was absolutely the right thing to do. I never doubted it for a second." It was not until three or four hours after the robbery that Samples claimed he realized what he had done was wrong.

Dr. Charles Peterson, Samples's treating psychologist, testified that Samples first sought help for depression at the Veteran's Affairs Hospital in March 2000. He was seen in the urgent care area and referred to the post-traumatic stress recovery program, where he was ultimately diagnosed with major depressive disorder and chronic post-traumatic stress disorder. These were traced to an event during Samples's naval service in the Persian Gulf in 1987, in which he survived a missile attack on his ship. Thirty-seven of his fellow crew members died in the attack. Samples received the Navy and Marine Corps Medal for Heroism as a result of his actions that day. The following citation for the award was read to the jury:

> U.S.S. Stark was struck by two Iraqi air to surface missiles resulting in a mass conflagration, complicated by flooding and battle damage[.] [W]ithout regard for his own personal safety, Petty Officer Samples moved several Stinger missiles out of fires that were spreading to the 03 level. He went below decks to investigate the missile magazine and found that the sprinkling system was inoperative. He sat inside of the

> magazine for 15 hours using a fire hose to cool the missiles and fill the magazine with water, thus preventing them from exploding.

One of Samples's shipmates testified to this occurrence, as did Samples. Dr. Peterson testified that Samples reacted to this traumatic incident with horror and helplessness, had recurrent nightmares of the event, and displayed numbing, avoidance, and hyper-arousal symptoms. Dr. Peterson testified that these symptoms had disrupted Samples's functioning in "almost every sphere of his life," and thus Samples met all the diagnostic criteria for post-traumatic stress disorder.

Dr. Peterson, as well as the two psychiatrists who testified at trial, agreed that Samples's mental health condition worsened as a result of his participation in an epidemiological study held by the Veteran's Affairs Hospital for service members with Hepatitis C. Samples was approved for treatment in the study in September 2000 despite the fact that the drug being used, Interferon, was known to exacerbate the effects of pre-existing mental illnesses. Dr. Peterson testified that by October, Samples's depression was "spiraling out of control" and that he was "really dysfunctional in all spheres," as well as entertaining suicidal thoughts. In January 2001, Samples stopped coming to the post-traumatic stress disorder clinic for his appointments. Dr. Peterson met with Samples after the robbery in May and testified that "at that point he had lost touch with present reality and had slipped into a different reality of the horror on the U.S.S. Stark." When Samples was discharged from the psychiatric ward at the VA Hospital he scored a 25 out of 100 on a global assessment of functioning, which Dr. Peterson testified is the level of "patients who are psychotic, who do not know right from wrong."

Dr. Coleman Smith, a hepatologist with extensive experience with Interferon treatment, testified that he would not have treated a patient with Samples's history of mental illness with Interferon without close monitoring by a psychiatry staff. Furthermore, based on his reading of the record he concluded that it was "more likely

than not" that the Interferon was causally related to the credit union robbery. Dr. Stanley Rosenberg, a psychiatrist whose research included the treatment of mentally ill patients with Hepatitis, also testified for the defense. He testified that Samples's symptoms were consistent with those reported in the literature on Interferon, and that at the time of the robbery, Samples was suffering from acute delusional symptoms, thinking illogically, and totally suicidal.

The government called two experts: Dr. Jason Dana, a forensic psychologist for the FBI, and Dr. Karen Bruggemeyer, a forensic psychiatrist. Dr. Dana testified that Samples was not always a reliable provider of information and that suicidal thinking does not always indicate a break from reality or psychosis. He also testified that the level of planning that went into the robbery as well as Samples's ambivalence about the crime before entering the bank were significant indicators of whether he knew what he was doing was wrong. Dr. Bruggemeyer testified that the Interferon exacerbated Samples's depression and contributed to his decision to rob the bank. She testified that Samples was suffering from psychotic delusions at the time of the robbery. However, she also underscored the importance of Samples's ambivalence before the robbery and the level of planning, stating:

> Mr. Samples essentially was telling me that what I did was the right thing to do. Those were the words that he was saying but his actions spoke differently to me. He took measures to hide what he was saying was the right thing to do. He hid who he was. He hid his identity. He covered his face. He covered his fingerprints. He covered the serial numbers of his gun. He fled the scene of the crime. And he had a rather elaborate method of leaving where he was going. He had parked his car one place and left a bike another place and then had scuba gear another, and took great lengths to hide something that he believed was right. He also lied about what he was doing. He lied to his wife. He lied to the FBI. He also said he felt guilty about it. And these are things that if a person believes that they are truly doing the right thing, they don't experience this.

In the government's closing argument and rebuttal, the prosecutor emphasized these expert opinions, as well as the lies Samples told to his care-givers, his wife, and the FBI about his mental state and the robbery. The prosecutor drew attention to aspects of the planning and execution of the robbery that suggested that Samples was sane, including the fact that he only took large denominations of cash from the credit union and refused to take one-dollar bills. The prosecutor also underlined the importance of a taped telephone conversation between Samples and his mother while he was in jail in which he described a discussion with his lawyer. The prosecutor played the tape for the jury and on the tape Samples says, "But, what he is saying is you either have to say you are guilty, or you have to say I'm innocent because of temporary insanity. And temporary insanity, the definition of that is you don't know right from wrong, which I obviously did, because I planned some things. . . ."

After two days of deliberation, the jury found Samples guilty of both the credit union robbery and gun counts. Samples filed a motion for a new trial five days later, arguing that the verdict was against the weight of the evidence; the prosecutor violated the pretrial ruling on the proper use of evidence of his flight; the prosecutor violated Federal Rule of Evidence 704(b) in questioning the experts; and evidence of Samples's release status was used improperly. The district court denied the motion. Samples appeals on the grounds that the prosecutor's use of inadmissible evidence unduly influenced the jury's ability to assess whether he was insane.

II.

We review the denial of a motion for a new trial for abuse of discretion. United States v. Aldrich, 169 F.3d 526, 528 (8th Cir. 1999). We will reverse the district court's decision if a new trial is necessary to avoid a miscarriage of justice. Id. Samples claims that he was deprived of a fair trial as a result of prosecutorial misconduct. This circuit employs a two-part test to determine whether a conviction

should be reversed for prosecutorial misconduct: (1) the prosecutor's remarks or conduct must have been improper; and (2) the remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003). The prejudicial effect of the conduct is determined by considering: (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative action taken by the district court. Id. We recognize that the district court is in a better position than we are to determine the effect of improper questioning or testimony on a jury. United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993).

A.

Samples first argues that the prosecutor knowingly violated the district court's pretrial order limiting evidence of his fifteen-month flight and improperly focused the jury on this evidence in his closing argument. Samples contends that the prosecutor's comments about his flight may have influenced the jury to decide the case based on his willingness to violate the law, rather than his mental state.

During the motions hearing before trial, defense counsel moved to exclude evidence of Samples's flight entirely, based on the concern that the government would use it as propensity evidence that Samples robbed the bank "because he is a bad man." However, the district court found that Samples's flight was relevant to the trial in a number of ways. First, the flight resulted in a delay between the crime and the mental health evaluations, which were not conducted until Samples returned to Minnesota. Second, aside from the effects of the Interferon treatment, Samples's mental health diagnosis was a permanent one, so his flight was relevant in terms of whether it was behavior consistent with his underlying diagnosis. Third, Samples claimed that he robbed the bank in an effort to provide for his son, and his later flight with his son was evidence of the importance of that relationship. As a result, the district court

concluded that evidence of Samples's flight would be allowed as circumstantial evidence of his mental and emotional condition on the date of the robbery. The judge ruled:

> The issue in the case would be the manifestations and the characteristics of his mental and emotional condition and how it manifested itself on the date in question of the robbery and how that relates to '87 all the way out to the alleged robbery. . . .
>
> . . .
>
> [The flight evidence] certainly proves – the Government will say that it proves the intent and the lack of presence of insanity on the date in question. I will allow it for that reason. It clearly isn't propensity evidence in that regard.
>
> . . .
>
> So, the parameters of this ruling are as follows: I can see on a straight flight 403 balance, I find that if that was the only relevant purpose of its admission, that the probative value would be substantially outweighed by the unfair prejudice.
>
> So what I envision is this. It is a proper course of cross examination of the doctors that are called. In other words, whether this conduct - - and I will define what I will allow by this conduct following the robbery [ - - ] was consistent with the diagnosis and the manifestations and characteristics of the diagnosis itself, and the extent of the mental illness that leads to the claim of legal insanity.
>
> What I won't allow is a discussion of the plea agreement, the timing of it all. . . .
>
> . . .
>
> I won't allow the use of the false name, attempts to buy the house.
>
> . . .
>
> There shouldn't be a mention of the phrase kidnapping . . . or the felony or misdemeanor of interference with the custodial rights of another. This all can be done without that list of alleged other crimes, based upon how I see its relevance.

The district court also noted the possibility that the defense might want to mitigate the effect of the flight by bringing it up before the experts took the stand.

At trial, defense counsel asked for clarification as to the parameters of the ruling, as he intended to elicit the basic facts of Samples's flight from Samples on direct examination. The district court stated:

> What I assume, regardless of who it comes from, it is appropriate to say, one, he left with Christopher, why he left, why he didn't return, under what circumstances and over what length of time he returned, and I suppose included in that is whether or not Christopher's mother was in contact with Christopher and or Mr. Samples. . . .
>
> . . .
>
> And I think the only difference with the experts will be whether what I just described is consistent with or a manifestation or a characteristic of someone with the diagnosis. And if not, why not.

Samples claims that the government violated the district court's order in two instances.[2] Samples first challenges the following exchange during the government's direct examination of Dr. Bruggemeyer:

> Q: You understand that Mr. Samples, as he testified that he took his son in May of 2002, and was gone was a fugitive for 15 months and where he was caught in Ohio; do you understand that?
> A: Yes, we talked about that.
> Q: What is the significance of that as it relates to his consciousness of guilty [sic]?
> A: The significance was that he told me it wasn't right which meant that he was guilty about it.

---

[2]The government claims on appeal that Samples "opened the door" to any impermissible use of the flight evidence when he testified to the facts of the flight during defense counsel's direct examination. The government argues that his testimony was in violation of the pretrial ruling because it was not introduced during the cross-examination of an expert. This argument reads the district court's order too narrowly and disregards the above discussion between counsel and the court about introducing the evidence during Samples's direct examination.

Defense counsel did not object to this line of inquiry, so we review for plain error. Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 730-32 (1993). Samples claims that this questioning violated the pretrial ruling by failing to relate the flight evidence to his diagnosis. However, Dr. Bruggemeyer's comment relates to Samples's mental state at the time of his flight. The district court later clarified during the prosecutor's rebuttal that the jury could consider Samples's flight for this purpose. This instruction is consistent with the purpose of the pretrial ruling, which was to avoid the use of the flight evidence as propensity evidence. Thus, if error at all, the admission of this comment did not rise to the level of plain error.

Samples also challenges the following statement by the prosecutor during rebuttal:

> [I]f Samples hadn't put a loaded gun in front of those women, robbed the Credit Union at gunpoint, taken his son as a fugitive and fled for 15 months, we wouldn't be here. Samples fled because of a consciousness of guilt. He knows he is guilty.

Defense counsel objected on the grounds of misuse of evidence. The court sustained the objection in part, stating, "I would allow it for his mental state at the time of his leaving the state with his son." Samples argues that the district court should have also given a curative instruction. The prosecutor continued after the objection was partially sustained, "He fled because of a consciousness of guilt. He knew that he is guilty and he didn't want to face the Judge to find out whether he would get probation or prison." Defense counsel did not object to these remarks.

In light of the purpose of the district court's pretrial ruling, the prosecutor's comments do not appear to be improper. The district court contemplated that the government could use the evidence of flight as circumstantial evidence of a lack of insanity, and stated, "It clearly isn't propensity evidence in that regard." Furthermore, in its final instructions, the district court counseled the jury, "You may consider

evidence of defendant's mental condition before or after the crime to decide whether defendant was insane at the time of the crime." We have allowed evidence of flight in insanity cases for the purpose of deciding whether the defendant could appreciate the wrongfulness of his actions at the time of the crime. See United States v. Hiebert, 30 F.3d 1005, 1007 (8th Cir. 1994) ("A defendant's attempt to conceal his commission of a crime suggests that he knows the action is wrongful, and the defendant's knowledge that one crime was wrong evidences that he understood that other criminal acts were inappropriate.") Whether Samples was sane at the time of the robbery depended on whether he was capable of being conscious of guilt and understanding right from wrong on that date. If Samples fled because he was conscious of guilt at the time of flight, that is relevant to whether he could have been conscious of guilt at the time of the robbery. It is not propensity evidence as to whether Samples was a bad person, which is what the district court stated would be impermissible.

Even if the prosecutor's remarks violated the pretrial ruling, the cumulative effect of the remarks, the strength of the properly admitted evidence, and the actions taken by the district court, lead us to conclude that the remarks did not deprive Samples of a fair trial. See United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003). The cumulative effect of the remarks was minimal because they were confined to a few sentences of the prosecutor's rebuttal and were neither pronounced nor persistent. See Berger v. United States, 295 U.S. 78, 89 (1935). The jury heard extensive amounts of properly admitted evidence of Samples's mental state from experts, lay witnesses, and Samples himself during the five-day jury trial, so it is unlikely that these remarks would have caused the jury to reach its verdict on an improper basis. See, e.g., United States v. Cole, 380 F.3d 422, 427 (8th Cir. 2004) (government's violation of pretrial order excluding evidence of prior bad acts was harmless in light of strong evidence and wide array of other testimony against the defendant); United States v. Moore, 911 F.2d 140, 143-44 (8th Cir. 1990) (government's violation of pretrial exclusion of evidence was harmless in light of

cautionary instruction, fact that error only constituted two lines of transcript, and the strength of the evidence against the defendant). Samples's ambivalence both before and after the robbery, his detailed plan and purchase of equipment specifically for the robbery, the fact that he concealed himself and the serial numbers on the gun, his escape effort, as well as the lies he told to cover himself and his admission on tape to his mother, all would suggest to a reasonable jury that he understood the nature and quality of his actions. See, e.g., United States v. Freeman, 804 F.2d 1574, 1577 (11th Cir. 1986) (defendant likely knew bank robbery was wrongful in light of his efforts to conceal himself, the use of a handgun, and his escape plan). That Samples suffers from mental illnesses and was suicidal or even psychotic on the date of the robbery does not establish that he could not appreciate the wrongfulness of his behavior. See Id.; Hiebert, 30 F.3d at 1008; United States v. Dubray, 854 F.2d 1099, 1101 (8th Cir. 1988); United States v. Levine, 80 F.3d 129, 136 (5th Cir. 1996) (despite defendant's diagnosis of bipolar disorder, his actions up to, during, and after the robbery suggested he knew the wrongfulness of his conduct).

This is not a case where absent the allegedly improper comments, a jury reasonably could have reached a different outcome or where the improper remarks "substantially bolstered" the case against the defendant. United States v. Beeks, 224 F.3d 741, 747 (8th Cir. 2000); Conrad, 320 F.3d at 856. Furthermore, the district court took the curative action of reminding the jury of the purpose for which the evidence could be considered and then later counseling, "If you were instructed during the case that I received a piece of evidence for a limited purpose, you must follow that instruction." Consequently, we conclude that the district court did not abuse its discretion in finding that the prosecutor's statements about Samples's flight did not improperly influence the verdict.

B.

Samples also argues that the prosecutor knowingly elicited testimony in violation of Federal Rule of Evidence 704(b) and then improperly used that evidence in his closing argument. Rule 704(b) states:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

In a case where a defendant presents insanity as an affirmative defense, Rule 704(b) prohibits a mental health expert from expressing an opinion on the ultimate legal issue of whether the defendant was able to appreciate the wrongfulness of his actions at the time of the crime. United States v. Kristiansen, 901 F.2d 1463, 1466 (8th Cir. 1990). The purpose of the rule is to allow juries, not experts, to make the ultimate determination of whether or not the defendant is sane. United States v. West, 962 F.2d 1243, 1247 fn.3 (7th Cir. 1992). Experts may testify to the symptoms and qualities of the defendant's mental illness, as well as to whether that illness generally prevents those suffering from it from understanding the nature and quality of their actions. Kristiansen, 901 F.2d at 1466. However, experts must avoid subjective comments about whether the defendant's peculiar mental state at the time of the crime affected his ability to understand the wrongfulness of his actions. United States v. Brown, 32 F.3d 236, 239 (7th Cir. 1994).

The record makes apparent that both parties left the evidentiary door ajar and stretched the limits of what is permissible under Rule 704(b), and we conclude that, in this context, the government did no more than offer fair rebuttal. We have held that where the instigating party opens the door to questioning in violation of Rule 704(b), it is estopped from complaining if its adversary offers fair rebuttal. United

States v. Gipson, 862 F.2d 714, 717 (8th Cir. 1988); see also United States v. Beason, 220 F.3d 964, 968 (8th Cir. 2000) ("It is fundamental that where the defendant 'opened the door' and 'invited error' there can be no reversible error.") Furthermore, the district court sustained a number of objections and many of the questions that Samples now challenges were never answered, so there can be no claim of prejudicial error. United States v. Zabel, 702 F.2d 704, 710 (8th Cir. 1983).

Samples first challenges the government's cross-examination of Dr. Peterson. The prosecutor asked Dr. Peterson, "Post-Traumatic Stress Disorder does not equal a person being insane, isn't that correct?" and added that insane was a legal term with which the doctor was familiar. The district court sustained an objection to this question and the witness did not answer. The prosecutor then asked Dr. Peterson, "So, in other words, if a person knows and understands the nature and quality of their acts and the person knows the wrongfulness of their acts, then that person is not insane, is that correct?" The district court again sustained an objection under Rule 704(b) and the witness did not answer. These questions do not specifically inquire as to Samples's state of mind on the date of the robbery and so do not violate Rule 704(b). Kristiansen, 901 F.2d at 1465-66. In addition, the district court sustained the objections and the questions were never answered, so there was no prejudice. Zabel, 702 F.2d at 710.

Samples also contends that the prosecutor violated Rule 704(b) when he asked Dr. Dana, "If you assume that Mr. Samples suffered [intense post-traumatic stress disorder] and major depression at the time of the robbery, does that change your opinion regarding his ability to know – excuse me, to understand the nature and quality or the wrongfulness of his acts at that time?" Defense counsel posed an even more detailed question to Dr. Rosenberg earlier in the trial when he asked, "Would Major Depressive Disorder, severe, with psychotic features and Post-Traumatic Stress Disorder aggravated by Interferon treatment impair a person's ability to appreciate the moral wrongfulness of his actions?" Both questions come close to asking for an

opinion on the ultimate issue of whether Samples had the ability to understand the nature of his actions on the date of the robbery, but Samples cannot now challenge the prosecutor's question as violative of the Rule since defense counsel asked an almost identical question. Gipson, 862 F.2d at 717. Furthermore, the question was objected to and Dr. Dana did not answer it, so there was no prejudice. Zabel, 702 F.2d at 710.

Lastly, Samples focuses on the testimony of Dr. Bruggemeyer. During direct examination, the prosecutor asked, "On May 3, 2001, if Mr. Samples understands that it's wrong to shoot a teller, how does that relate to his understanding of the wrongfulness of robbing the credit union?" The district court sustained an objection under Rule 704(b) and Dr. Bruggemeyer did not answer. The prosecutor then asked, "How does your opinion, how is it manifested in the characteristics that relate to your diagnosis and opinion, relate to if Mr. Samples understood it as wrong to shoot a teller versus the bank, robbing the credit union?" The district court sustained another objection under Rule 704(b) and stated that it would allow the question of "the wrongfulness of shooting a teller, if it's consistent with his diagnosis or what you would expect to see." Dr. Bruggemeyer responded, "If he knew it was wrong to shoot a teller, he knew it was wrong to rob a bank." Defense counsel objected to this answer and made a motion to strike, which the district court granted. The court stated, "Ask the jury to disregard the last phrase 'knew it was wrong to rob the bank.'" Later, during the cross-examination of Dr. Bruggemeyer, defense counsel tried to clarify that just because Samples later understood when he was in the river that the robbery was wrong, he did not necessarily know it was wrong during the robbery. Dr. Bruggemeyer responded, "In my opinion, he knew it was wrong both times." The government quoted this statement during rebuttal, stating "He knew it in the water, and in her opinion, he knew it during the robbery. That says it all." Defense counsel did not object to this statement.

Dr. Bruggemeyer's statement that Samples knew it was wrong to rob the bank is a direct violation of Rule 704(b)'s mandate that experts not express opinions on the ultimate issue of a defendant's sanity. However, her first response was stricken from the record and the district court later instructed the jury that "any testimony or exhibit ordered stricken by me must be entirely disregarded by you." Thus, any error was cured. United States v. Guerra, 113 F.3d 809, 815 (8th Cir. 1997); see also Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions"). Dr. Bruggemeyer's second response was elicited by defense counsel's question, "the fact that he becomes aware several hours after the robbery that what he had done was wrong, does not indicate necessarily that he knew it was wrong before going into the bank?" Because Dr. Bruggemeyer's answer cannot be characterized as non-responsive to this question, defense counsel is responsible for inviting the Rule 704(b) violation. Gipson, 862 F.2d at 717. Finally, in referring to the answer in rebuttal, the prosecutor was simply using evidence to which the defense counsel had opened the door, which we have held to be permissible. Id.; United States v. Schwartz, 655 F.2d 140, 142 (8th Cir. 1981); Beason, 220 F.3d at 968.

Even were we to conclude that the prosecutor's comment did not constitute fair rebuttal for what defense counsel had already invited, we review only for plain error because defense counsel failed to object. Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 730-32 (1993). "If an arguably improper statement made during closing argument is not objected to by defense counsel, we will only reverse under exceptional circumstances." United States v. Eldridge, 984 F.2d 943, 947 (8th Cir. 1993). The prosecutor's comment does not rise to the level of plain error or present exceptional circumstances in light of the substantial other evidence as to Samples's mental state presented to the jury and the judge's instruction to the jury that "[e]xpert testimony should be considered just like all testimony in the case. That is, you may accept or reject it and give it as much weight as you think it deserves. . . ." See United States v. Waldman, 310 F.3d 1074, 1078-79 (8th Cir. 2002) (where there was substantial evidence of intent and a curative jury instruction, violation of 704(b) by

expert did not amount to plain error). We conclude that the district court did not abuse its discretion by finding that the interests of justice did not require a new trial on this ground.

C.

Samples additionally argues that the prosecutor engaged in misconduct by using Samples's bond status as an indication that he was not insane at the time of the offense. Over defense counsel's objection, the district court allowed a pretrial services officer to testify that Samples was not required to stay in a hospital as a condition of his bond. In his closing argument, the prosecutor stated, "Mr. Samples was released that day. Samples went home. Do you think a federal judge would just let an insane man go home only a few days after the robbery?" Defense counsel objected, but the district court overruled the objection, stating, "I will allow it based upon that is an inference of the evidence, and the jury will evaluate it along with all of the other evidence." In the order denying the motion for a new trial, the district court ruled that the comments were in fact improper, but that they did not cloak the government with the authority of the court or otherwise influence the verdict.

The district court has "broad discretion in controlling closing arguments and this court will not reverse absent a showing of abuse of discretion." United States v. Johnson, 968 F.2d 768, 769 (8th Cir. 1992). We agree with the district court that the prosecutor's argument was improper because the legal standard for release is irrelevant to whether Samples proved by clear and convincing evidence that he was insane at the time of the offense. However, we will reverse the conviction only if we determine that the jury verdict could reasonably have been affected by the prosecutor's improper comments. Id. at 770. We must once again evaluate the cumulative effect of the misconduct, the strength of properly admitted evidence, and the curative actions taken by the court. United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003). The conduct in question had no cumulative effect because it constituted a single improper remark in the prosecutor's closing argument, United

States v. McGuire, 45 F.3d 1177, 1190 (8th Cir. 1995), and it was "dwarfed by the extensive testimony on the insanity issue by both sides." United States v. Santos, 131 F.3d 16, 20 (1st Cir. 1997). As we stated above, the record includes a wide array of testimony and evidence suggesting that Samples was sane at the time of the crime, and therefore this remark was insufficient to constitute prejudicial error. See United States v. Cole, 380 F.3d 422, 427 (8th Cir. 2004). The district court also took the curative action of instructing the jury, "Questions, objections, statements and arguments of counsel are not evidence in this case." See United States v. Fletcher, 322 F.3d 508, 517 (8th Cir. 2003). While we disapprove of the prosecutor's improper remarks, we conclude that the district court did not abuse its discretion in finding that these objectionable comments did not influence the verdict.

D.

Samples also contends that the cumulative effect of the alleged errors warrant a new trial. "We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Riddle, 193 F.3d 995, 998 (8th Cir. 1999). To reverse based upon the cumulative effect of errors, we must hold that there has been substantial prejudice to the defendant. United States v. Steffen, 641 F.2d 591, 598 (8th Cir. 1981). Based on the above analysis, we cannot conclude that the cumulative effect of the alleged errors "fatally infected" Samples's trial or resulted in a miscarriage of justice. United States v. LaFuente, 54 F.3d 457, 462 (8th Cir. 1995). We affirm.

BRIGHT, Circuit Judge, dissenting.

I dissent. The prosecutor recognized Samples as a hero, but in his prosecution, the government dealt him foul blows that deprived Samples, hero or not, of a fair trial. Samples is entitled to relief by giving him a new trial.

In this case of a very bizarre robbery and an attempt to escape as related in the majority opinion, we have strong and basically unrefuted medical testimony that Samples suffered a major and serious depressive disorder with psychotic symptoms and chronic post-traumatic stress disorder (PTSD) at the time of this strange robbery incident. Thus, defendant made a strong case for a temporary insanity defense.

As we know, his illness stemmed from his heroic action as a member of the armed forces' pre-Gulf War activity. For emphasis, we repeat the action story from the trial transcript. Samples's conduct resulted in his receipt of the Navy and Marine Corps Medal for Heroism:

> In 1987, Mr. Samples was a sailor in the United States Navy, stationed on the U.S.S. Stark. The Stark patrolled the Persian Gulf and acted as an escort to oil tankers. During this period, the war between Iran and Iraq created instability in the Gulf region, subjecting tankers to the danger of missile attack. On May 17, 1987, a little after 9 p.m., an Iraqi Mirage fired two Exocet missiles at the Stark and hit the ship. When the first missile hit, it didn't explode. The second missile hit the same spot and lit all of the fuel from the original one on fire.
>
> Mark Samples was on duty on the third level of the ship. The missiles hit just above the water line. The walls of the ship, soaked in fuel, began to burn. Mr. Samples noticed that the boxes containing hand-held Stinger missiles were beginning to burn. After confirming with the Captain, he threw the boxes overboard. He then put on a gas mask, went to the bridge and steered the ship based on radio orders for about a half an hour. Someone came up to him and told him that the missile launcher was starting to smoke. When Mr. Samples went to investigate, he found the fire had advanced to the missile magazine. He knew, being a gunner's mate, that if their missiles exploded, it would destroy the ship and everyone on board. If that happened, about 200 sailors would die. To keep that from happening, Mr. Samples hooked up a pump and sat on the side of the missile silo for 17 hours, pumping water from the Gulf on the missiles, cooling them. The walls glowed red and some of the missiles became so hot the paint began to peel off of them.

> At some point in the middle of this Mr. Samples was spelled by another sailor and asked to go through the missile launcher to see if he could get a door open from the inside. The firefighters couldn't get at it from their side. Mr. Samples crawled through the launcher, a narrow space, having to take off his breathing mask at times to get through. When he found the door damaged beyond hope of opening, he went aft to see if he could get more information about the extent of the fire. His path led through downed electrical wires, smoke-filled dark and damaged corridors where he at times had to crawl to get through. He eventually made it to the berthing area where he found the bodies of all the men who had been trapped. They were dead. Chris D'Angelo, Mr. Samples best friend, was there. Mark held his body for a while, then put it down and went back to the missile magazine to fight the fires. Finally, members from other ships arrived and took over the fighting the fire.
>
> Mr. Samples wasn't the only sailor on the Stark who survived, but suffered indelibly from going through that attack. William Morandi, who was in the berthing area when the attack occurred, managed to escape out of the hole the missile made and spent the night in the Persian Gulf with another crew member who made it out. From the 28-29 sailors in his area, five made it out. Thirty-seven crew members died that night.

Samples's Br. at 11-13 (footnotes omitted).

Moreover, his illness was significantly exacerbated by his taking of the drug Interferon as prescribed by doctors at the Veteran's Affairs Hospital to treat Samples's hepatitis C.[3]

---

[3]Forensic psychologist, Dr. Jason Dana, would not concede that the Interferon exacerbated Samples's mental illness. He also would not concede Samples suffered psychotic symptoms because Samples had periods of lucidity where he realized the error in his delusions. However, he did concede that he is not a medical doctor, did not focus on the effects of Interferon in this case, and lacked the background to answer questions on the adverse effects of Interferon as they relate to this case.

Dr. Karen Bruggemeyer was the government witness ordered by the district court to address the use of Interferon by Samples. She testified that Samples's

The VA's hepatitis C clinic approved Samples for a clinical treatment study using Interferon and Ribavirin with an understanding he would be monitored by a VA psychologist in its post-traumatic stress disorder clinic. Together, these drugs are targeted to get rid of the hepatitis C virus. Beginning September 5, 2000, Samples took Interferon three times a week, Monday, Wednesday, and Friday by self-injection, and Ribavirin orally twice a day. The known side effects of Interferon include becoming suicidal, psychotic, and homicidal. Further, the brand manufacturer warned that "extreme caution should be taken in using Interferon on patients with pre-existing mental health histories." Trial Tr. at 784-85. Such patients are particularly at risk for having aggravated psychiatric side effects from the Interferon.

On November 9, 2000, Samples reported to the VA that he was thinking about killing himself. His antidepressant medication was increased, but he was not taken off the Interferon. On January 4, 2001, Samples reported an increase in irritability, dropping out of classes at school, and difficulty sleeping. At this point, he dropped out of psychiatric care, but he was not taken off the Interferon. He next contacted the post-traumatic stress disorder clinic on May 4, 2001, the day after the robbery.

The effects of the Interferon on Samples's mental illness in the months leading up to the robbery also produced paranoid delusions. He came to believe that his wife was trying to kill him. He stopped eating meals she prepared. He tried to avoid her by hiding out in the basement. He started sleeping with a gun. And he contemplated killing her by staging a car accident. Samples also believed the government was

---

paranoid delusions and cognitive distortions would occur in cycles depending on when he last took Interferon. (Dr. Dana testified that records reflect Samples last took Interferon on the day of the robbery, May 3, 2001.) Based on her knowledge of the interaction between Samples's preexisting mental illness and Interferon, Dr. Bruggemeyer agreed with the doctors presented by the defense – the Interferon exacerbated Samples's mental illness, made him experience psychotic symptoms, and causally contributed to the robbery.

trying to kill him to eliminate the survivors of the U.S.S. Stark and he was being followed by government agents.

The question for the jury was whether on May 3, 2001, Samples knew right from wrong when he robbed a bank as a means of giving his family financial security, as he contemplated taking his own life following the incident.

Samples made a strong case for temporary insanity, taking into account his severe depression aggravated into a psychosis by the continuing Interferon treatment, existing to and on the day of the robbery. Indeed on May 8, five days after the robbery, experts at the VA hospital gave Samples a global assessment of functioning test which resulted in a score of twenty-five out of one hundred, showing him functioning at a psychotic level, to an extent where a patient does not, or may not, know right from wrong.

With this strong evidence as a defense, the prosecutor did not focus on this temporary insanity condition. Instead, he confused the issue by arguing that Samples's admission of wrongful conduct in bail jumping, thirteen months after the robbery, served to establish his consciousness of guilt at the time of the robbery.

Samples brought a pretrial motion to exclude all evidence relating to his flight, thirteen months after the robbery, as irrelevant to the case because he had already pleaded guilty to the charge of failure to appear for trial and had been off Interferon for thirteen months. The motion further argued that introducing evidence of Samples committing bad acts thirteen months after the robbery could lead the jury to convict him on an improper basis.

Defense counsel argued:

> [T]he single issue before the jury . . . is what was Mr. Sample's [sic] mental state on May 3rd, 2001, at the time that he robbed the bank? And none of this evidence relates in any way to that issue.
>
> . . . .
>
> [T]he defense is very clearly that this mental illness was episodic in nature . . . .
>
> The issue is whether those conditions were so aggravated by the Interferon treatment as to make him psychotic at the time of the offense.
>
> And, if so, . . . whether by virtue of that psychoses he was unable to appreciate the nature and wrongfulness of his actions.

Trial Tr. at 32, 38-39.

Defense counsel explained the reports by the expert witnesses do not treat the fifteen-month period during which Samples remained a fugitive as significant to his mental condition on May 3, 2001. Defense counsel further explained that Samples did not claim that he was insane at the time he fled in June 2002, as evidenced by his guilty plea on that charge.

The government responded that it wished to use Samples's flight in June 2002 as consciousness of guilt on the May 3, 2001 offense. The government argued that the "evidence is not only relevant, but it is highly probative of a consciousness of guilt. He knew he was guilty, so he started a new life, because he didn't want to be away from his son . . . ." Trial Tr. at 46.

In its pretrial ruling on the issue, the district court reasoned,

> [I]t is the Defendant's view that the manifestation of the mental illness is episodic. To me, it is a classic case where, not for flight, but it is circumstantially relevant, the 15 months . . . .
>
> It is circumstantially relevant to the mental, emotional condition of the Defendant as follows: He has a diagnosis. It is dependent upon,

> in large part, from '87 on out. It is a diagnosis that wasn't a fleeting diagnosis. He continues to suffer from it.
>
> The issue in the case would be the manifestations and the characteristics of his mental and emotional condition and how it manifested itself on the date in question of the robbery and how that relates to '87 all the way out to the alleged robbery.

Trial Tr. at 71-72.

The majority opinion further explains the contours of the district court's decision at pp. 8-9.

Following the ruling, Samples's attorney asked the court to review the expert reports "to see whether it has any bearing on the Court's ruling, because I continue to believe that the fact of Mr. Samples' conduct over a year after the offense has no bearing on the diagnoses or the opinions of the experts with respect to what happened on May 3rd." Trial Tr. at 84.

The district court noted "the objection by the Defense" to the extent it denied the pretrial motion and decided the trial would include evidence of Samples's flight thirteen months after the robbery.

The trial evidence bore out Samples's pretrial explanation of the insanity defense at issue. Samples's defense did not rest merely on the continuing PTSD and depressive illness, existing long before the May 3 incident and continuing during all the times discussed in the trial, but focused on the aggravation or exacerbation from the Interferon treatments, which the experts addressing the issue agreed led to symptoms of psychosis.

The first defense expert, Dr. Charles Peterson, testified that after Samples started Interferon, his level of depression "deepened significantly". Trial Tr. at 450, 467. "He really deteriorated at this point." Trial Tr. at 450. "He was really

dysfunctional in all spheres . . . ." Trial Tr. at 450. Dr. Peterson testified that Samples scored twenty-five out of one hundred on the global assessment of functioning test administered on May 8, showing "the level of patients who are psychotic, who do not know right from wrong . . . ." Trial Tr. at 458, 460. "[T]he combination of Post-Traumatic Stress Disorder, Depression and Interferon effect[ed] Mr. Samples' judgment and rational thinking[.]" Trial Tr. at 467.

The next defense expert, Dr. Coleman Smith, testified that the Interferon deepened Samples's depression, leading to psychotic symptoms, and probably had a causal relationship to the robbery. "[I]nterferon does effect the brain and does cause psychiatric problems. And these psychiatric problems are more manifest in people with an underlying history of psychiatric illness." Trial Tr. at 492. He read the manufacturer's warning label regarding Interferon use, "Severe psychiatric adverse events, including depression, psychoses, aggressive behavior, hallucinations, violent behavior, (suicidal ideation, suicidal attempts, suicides) and rare instances of homicidal ideation . . . ." Trial Tr. at 497. The manufacturer further warned that extreme caution should be taken in using Interferon on patients with pre-existing psychiatric disorders.

The final defense expert, Dr. Stanley Rosenberg, concluded there was "a very good probability" that "Interferon treatment affected Mr. Samples' mental illness". Trial Tr. at 715. "[I]nterferon seemed to be making [Samples's] depression worse and worse." Trial Tr. at 701. In his opinion, there was a "probable" causal connection between the Interferon and robbery. Trial Tr. at 723.

Dr. Rosenberg explained the results of his evaluation of Samples's condition on May 3, 2001. It was "fairly clear-cut that Mr. Samples continued to meet diagnostic criteria for PTSD at the time of the robbery; that he was severely depressed, in fact depression not only at a severe level, but with psychotic symptoms; that he was actively suicidal at the time of the robbery; and that he was fairly

delusional at the time of the robbery and the days immediately preceding." Trial Tr. at 694. "He was just thinking a very bizarre and illogical way, psychotically distorted way." Trial Tr. at 719.

Further, Dr. Rosenberg testified that the exacerbated symptoms from Interferon would clear within days or weeks of discontinuing use. We know from the testimony that Samples last took Interferon on the day of the robbery, May 3, 2001, so his aggravated symptoms would have ended long before his flight in June 2002. The district court was wrong in its conclusion that Samples's flight in June 2002 was medically relevant to his ability to know right from wrong on May 3, 2001.

Moreover, the prosecutor did not even stay within the bounds of this erroneous ruling, resorting precisely to the consciousness of guilt purpose that the district court had rejected under Rule 403.

Here is the record.

Samples headed the suggestion of the district court and mitigated the effect of his pretrial flight from the jurisdiction by bringing it up before the government did so.

Samples testified that in June 2002, he took his son from Minnesota to West Virginia and had hopes of getting his marriage back together. But when he got to West Virginia, he learned a warrant had issued for his arrest and panicked, fleeing with his son for fifteen months. He did not tell his son's mother where they were during this time. In September 2003, he was arrested in Ohio for failure to appear for trial. He pled guilty, explaining he made no claim that he was insane at the time he left the jurisdiction of Minnesota.

Rather than focus on how Samples's flight in June 2002 related to the manifestations and characteristics of his diagnosis, as the district court had ordered, the prosecutor turned Dr. Bruggemeyer's testimony to support consciousness of guilt on May 3.

> BY [PROSECUTOR]:
> Q Doctor, what, if any, significance is there in your diagnosis and your opinion in evaluation of Mr. Samples to the extent that he robbed the credit union May 3, 2001, versus the time in May of 2002 that he took his son and left for 15 months?
> A I'm not following what your question is, [Prosecutor].
> Q I'm not sure I follow it either. You understand that Mr. Samples, as he testified that he took his son in May of 2002, and was gone was a fugitive for 15 months and where he was caught in Ohio; do you understand that?
> A Yes, we talked about that.
> Q What is the significance of that as it relates to his consciousness of guilty?
> A The significance was that he told me it wasn't right which meant that he was guilty about it.

Trial Tr. at 851-52. Thus, this testimony, which appears to violate the pretrial restrictions on this type of evidence, gave the prosecutor a weapon to completely confuse the temporary insanity issue.

In the final rebuttal argument, the prosecutor put it all together in the improper framework below:

> [I]f Samples hadn't put a loaded gun in front of those women, robbed the Credit Union at gunpoint, taken his son as a fugitive and fled for 15 months, we wouldn't be here. Samples fled because of a consciousness of guilt. He knows that he is guilty.
> MR. RICHMAN: Objection, Your Honor, misuse of the evidence.

> THE COURT: I will sustain in part, deny in part. I would allow it for his mental state at the time of his leaving the state with his son. You may continue, [Prosecutor].
>
> [PROSECUTOR]: Thank you, Your Honor. He fled because of a consciousness of guilt.
>
> He knew that he is guilty and he didn't want to face the Judge to find out whether he would get probation or prison. Notwithstanding the fact that we have heard from psychiatrists and psychologists and hepatologists, stuff that is certainly beyond the understanding of a six-year-old, this case is about right and wrong. And as I said in the beginning of the trial, the theme would be, all I really need to know, I learned in kindergarten, right and wrong.
>
> Samples knew what he was doing and he knew that it was wrong.

Trial Tr. at 983-84.

The argument clearly was improper and devastating to the defense. It amounted to a clever ploy, but a wholly unfair one requiring a new trial.

But that is not all. The record shows that Samples was released from custody on May 14, 2001, eleven days after cessation of Interferon treatments. The prosecution introduced the following testimony through pretrial services officer Timothy Norgren. The dialogue between the prosecutor and Norgren included:

> Q. [D]o you make a report that is presented to the Court?
>
> A. [W]e prepare a report assessing the person's vulnerability, if you will, for the purposes of release or detention.
>
> Q. The factors that go into a Court's decision about a release would include a person's danger to himself or to others?
>
> A. Yes, it would.
>
> Q. And would it include the person's risk of flight?
>
> A. Yes, it would.
>
> . . . .
>
> Q. At some point did you come to supervise Mr. Samples?

A. Yes. He was originally detained on Friday of May 11th, 2001 and had a detention hearing on Monday, May 14th, 2001. And at the conclusion of that hearing, he was released.

. . . .

Q. The continuation of his health care at the VA Medical Hospital [as a condition of release], did that include his being admitted as a patient to stay at the hospital?
A. No, I don't believe so.
Q. So, he went home on May 14, 2001?
A. Yes, he did.

Trial Tr. at 305-07.

The prosecutor used this evidence to obfuscate the issue of temporary insanity on May 3, by asserting apparent sanity on May 14. The prosecutor made this purpose clear to the jury during final oral presentation, stating this gem, "Mr. Samples was released that day. Samples went home. Do you think a federal judge would just let an insane man go home only a few days after the robbery?" Trial Tr. at 936.

As against an objection, the trial judge allowed the evidence to stand as "an inference from the evidence." Clearly, that ruling was wrong and the argument was improper and unfair.

The prosecutor's assertion did not relate to expert testimony on sanity nor did it repeat a statement of any judge about Samples's sanity. The testimony previously quoted related to release from custody based on whether the defendant was dangerous if released on May 14. As the record shows, and as we know, the standards for release pending trial and the standards for insanity are as different as night and day.

I want to comment on one aspect of the majority opinion relating to a telephone conversation between Samples and his mother on October 8, 2003 and discussed at p. 6.

The majority's observation fails to show the proper context for the exchange. See Slip Op. at 6. Samples knew that his conversation with his mother was being recorded by the county jail. As Samples explained, he was simply describing for his mother a conversation he had with his attorney about the law on insanity and how a jury might perceive the facts. A jury might conclude that he obviously knew right from wrong because he planned some aspects of the robbery. Samples testified that he was not aware of the definition of insanity until explained to him by his attorney. Samples also testified that when he planned the bank robbery and entered the bank, he believed "it was absolutely the right thing to do." Taken in context, the conversation had little or no relevance to the insanity defense.

In summary, the record of this case demonstrates that Samples served his government well as a member of the armed forces. But the same cannot be said of the government's service to Samples as a defendant in this trial.

The Supreme Court has explained what a defendant and jury may expect from a prosecutor in a fair trial:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently,

> improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88-89 (1935) (granting Berger a new trial based on prosecutor's misconduct and reasoning "[i]f the case against Berger had been strong, or, as some courts have said, the evidence of guilt 'overwhelming,' a different conclusion might be reached").

Consistent with Berger, this court grants a new trial if "the jury's verdict could reasonably have been affected by the prosecutor's improper comments." See United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003). In deciding this question, we consider "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court." Id.; see also Shurn v. Delo, 177 F.3d 662, 667 (8th Cir. 1999) (vacating Shurn's death sentence because, following prosecutor's improper remarks in closing argument, "reasonable probability exist[ed] that the error affected the outcome of the penalty phase").

This was a close case. The jury faced a difficult task in determining whether Samples knew right from wrong in committing the burglary, when unrefuted evidence disclosed that defendant suffered a serious mental illness with aggravation into a psychotic condition due to injecting the drug Interferon as ordered by physicians at the government's VA Hospital.

Instead of presenting the prosecution's case on this precise issue of Samples's knowledge of right and wrong on May 3, 2001 at the time of the robbery, the prosecutor confused the issue and made grossly improper arguments to the jury, which the district court failed to cure. As a result, Samples was deprived of a fair trial. Instead of eleven years in prison as was the sentence in this case, he deserves a new trial.

______________________



A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans